**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 19-cv-887

ALEXANDER ARMIJO,

      Plaintiff,

v.

LEROY GARCIA, in his official and individual capacities,

      Defendants.

---

**MOTION FOR PRELIMINARY INJUNCTION**

---

Plaintiff, by and through his attorneys Andy McNulty and Tania Valdez of KILLMER, LANE & NEWMAN, LLP, hereby files this Motion for Preliminary Injunction. Plaintiff respectfully requests that this Court enjoin Defendant from banning him from commenting on posts on Defendant's official Facebook page and, also, to enjoin Defendant from deleting any further comments made by Plaintiff on Defendant's official Facebook page on issues of public concern. The grounds for this motion are set forth fully herein:

1. **Introduction**

If nothing else, the First Amendment "rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public." *Associated Press v. United States*, 326 U.S. 1, 20 (1945). Today, Americans' exchange of political ideas happens increasingly on social media platforms like Facebook. Courts have appreciated the democratizing potential of cyberspace ever since their earliest encounters with the medium.

Two decades ago, the Supreme Court of the United States described the Internet as "a vast platform from which to address and hear from a worldwide audience." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 853 (1997). In providing "relatively unlimited, low-cost capacity for communication of all kinds," the Internet enables virtually anyone to "become a town crier with a voice that resonates farther than it could from any soapbox." *Id*. at 870. More recently, the Court identified the Internet—and "social media in particular"—as "the most important place[] . . . for the exchange of views" in contemporary life. *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017). As an instrument for "speaking and listening in the modern public square," social media affords "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Id*. at 1737. Facebook exemplifies the civic dynamism of social networking tools, for better or worse. Its users converse openly with one another on urgent social and political issues, inviting real-time responses from interested contributors. These discussions increasingly involve policymakers themselves, as Facebook enables Americans to "petition their elected representatives and otherwise engage with them in a direct manner." *Packingham*, 137 S. Ct. at 1735. Indeed, because of the platform's prominence, "Governors in all 50 States and almost every Member of Congress have set up accounts for this purpose." *Id*. The importance of Facebook as a forum for modern political discussion is self-evident.

Accordingly, courts "must exercise extreme caution before suggesting that the First Amendment provides scant protection for access to vast networks in that medium." *Id*. at 1736. The Supreme Court's classification of cyberspace as "the modern public square" "embraces the social norm that assumes the openness and accessibility of that forum to all comers." *hiQ Labs, Inc. v. LinkedIn Corp.*, No. 17-cv-03301-EMC, 2017 WL 3473663, at *7 (N.D. Cal. Aug. 14,

2017). Governmental restrictions on the use of social media—a "vital, developing forum"—cannot be permitted simply because "alternative channels" exist to transmit and receive information. *Davison v. Loudoun Cty. Bd. of Supervisors*, 267 F. Supp. 3d 702, 718 (E.D. Va. 2017) (concluding "that Defendant engaged in viewpoint discrimination by banning Plaintiff from her Facebook page").

Defendant Leroy Garcia, President of the Colorado Senate, has established and maintained an official Facebook page on which he discusses important political issues in Colorado. Defendant banned Plaintiff from commenting on his official Facebook page after Plaintiff criticized his actions in contributing to the firing of the nonpartisan Senate Secretary for allegedly partisan reasons. Defendant's banning of Plaintiff, and the deletion of his comment, has allowed Defendant to present the (false) impression that his constituent (and all Coloradoans) support his every decision. The skewing of information, and debate, is exactly what Defendant has accomplished through silencing Plaintiff's viewpoint.

Allowing Defendant to silence naysayers and allow only those who share his viewpoint to comment on his official Facebook page has dire consequences, in that it undermines one of the fundamental purposes of the First Amendment. Continuing to let Defendant selectively control who can comment on his official Facebook page would allow "one side of a debatable public question to have a monopoly in expressing its views[.]" *See Madison Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n*, 429 U.S. 167, 175–76 (1976).

Defendant is essentially carefully curating propaganda via social media. Over time, Defendant's approach to censoring critics may lead officials at all levels of government to seek to cultivate a false impression that they (and their political positions) are universally adored by

the public. Such practices are a familiar playbook for authoritarian regimes.[1] And they have

begun to creep into the United States, as evidenced by Defendant's actions, President Trump's

censorship of dissenting views on his Twitter account, and the recent Facebook scandal

involving Cambridge Analytica. This real-world exploitation of social media makes it all the

more important that the First Amendment remain a bulwark against any governmental impulse to

"silence dissent," "distort the marketplace of ideas," and "remove certain ideas or perspectives

from a broader debate." *Matal v. Tam*, 137 S. Ct. 1744, 1766–67 (2017) (Kennedy, J., concurring

in part and concurring in the judgment). Ultimately, "to cast disapproval on particular viewpoints

. . . risks the suppression of free speech and creative inquiry in one of the vital centers for the

Nation's intellectual life." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 836

(1995). Plaintiff asks that this Court not allow the residents of Colorado to undertake such a risk.

2. **Factual Background**[2]

---

[1] Seva Gunitsky, *Corrupting the Cyber-Commons: Social Media as a Tool of Autocratic Stability*, PERSPECTIVES ON POLITICS, Mar. 2015, at 42, 45 (discussing government use of social media in countries such as China, North Korea, and Russia to "reinforce regime legitimacy through careful management of online discourse," and concluding that "social media creates space for the management of public discourse that sidelines or discredits anti-regime sentiment, while at the same time mobilizing the regime's own supporters"); Arch Puddington, *Breaking Down Democracy: Goals, Strategies, and Methods of Modern Authoritarians* 19 (June 2017), Freedom House,
https://freedomhouse.org/sites/default/files/June2017_FH_Report_Breaking_Down_Democracy.pdf (reporting that China "deploys armies of paid and volunteer commentators to flood social media with progovernment remarks, influence online discussions, report or attack those who make antigovernment comments, or sow confusion about particular incidents that might reflect poorly on the leadership.").

[2] Should Defendants dispute the factual assertions in this Section, Plaintiff asks that this Court hold an evidentiary hearing prior to ruling on this Motion. *See Detroit & T. S. L. R.R. Co. v. Bhd. of Locomotive Firemen & Enginemen*, 357 F.2d 152 (6th Cir. 1966) (noting that under Rule 65(a), if there is controversy over facts, a hearing should be held at which time plaintiff should be required to offer evidence in support of allegations of complaint, and defendant should be afforded opportunity to offer testimony in opposition thereto); *McDonald's Corp. v. Robertson*, 147 F.3d 1301 (11th Cir. 1998) (holding that where facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue, evidentiary hearing must be held by district court); *Rothstein v. Manuti*, 235 F. Supp. 48 (S.D.N.Y. 1964)

2.1 **Facebook is a platform particularly well-suited for public debate and discussion.**

Plaintiff is a Facebook user who has been banned by Defendant from commenting on his official Facebook page because Plaintiff posted messages that were critical of Defendant. **Exhibit 1**, *Declaration of Alexander Armijo*, ¶¶ 15-22. Defendant's banning of Plaintiff prevents him from commenting on Defendant's posts and from participating in comment threads. *Id.* Defendant has essentially banished Plaintiff from the interactive space associated with Defendant's official Facebook page.

Facebook is a social media platform with more than 2.23 billion monthly active users, as of June 30, 2018. *See* Facebook, Inc., Quarterly Report (Form 10-Q) (October 31, 2018). In the United States, approximately two-thirds of adults are Facebook users. *Id.* Facebook allows its users to publish messages of any length (or publish Facebook "posts"), to republish other users' posts, and to respond to (or "comment on") other users' posts. *How to Use Facebook*, WIKIHOW, https://www.wikihow.com/Use-Facebook (last visited March 20, 2019). Speech on Facebook ranges from birthday wishes to heartfelt reconnections to political discourse. Particularly relevant to this lawsuit is the amount of speech by, to, and about the government at all levels that occurs on Facebook on a daily basis. Facebook users are those with an account that has been created on the platform. *Id.* A Facebook user's "profile" includes the user's name, a description of themselves, biographical information, work history, and other web pages maintained by the user. *Id.* A Facebook "profile" is a personal account on Facebook. *Id.* In contrast, a Facebook "page" is a user account created by a small business, public figure, company, or organization. *Id.* Many public officials create separate Facebook user "pages" that represent their official capacity as a

---

(finding that customarily, where many factual elements are in dispute on application for preliminary injunction, hearing is necessary to resolve disputed issues).

government, or public, official. These pages are called Community or Public Figure "pages" and differ from personal Facebook user profiles in appearance and content. *Id.* Facebook users who maintain "pages" often describe their official position on their page.

While personal Facebook profiles can be "protected" by users, which results in limits on who can see the user's timeline and who can search for their posts, Facebook pages cannot be limited in this way. *Id.* Users and creators of Facebook's pages, however, can "ban" individuals. *How to Ban Someone from a Page on Facebook*, WIKIHOW, https://www.wikihow.com/Ban-Someone-from-a-Page-on-Facebook (last visited March 20, 2019). When a user with a Facebook page "bans" an individual, that individual can no longer comment on the user's Facebook page. *Id.* If the banned user attempts to comment on a Facebook page that she or he has been banned from, she or he will only be given the opportunity to share the post and not be allowed to comment on the post. *Id.* Banned users also cannot see other users' comments on a post. *Id.*

### 2.2 **Defendant Garcia operates his official Facebook page in his capacity as a Colorado senator and president of the senate; and his page functions as a digital town hall for speech on political matters.**

Defendant maintains an official Facebook page in his official capacity as Colorado Senate President. Defendant is identified as "Senator Leroy Garcia" on his official Facebook page. Senator Leroy Garcia (@senleroygarcia), FACEBOOK, https://www.facebook.com/senleroygarcia/ (last visited March 19, 2019); *see also* **Exhibit 1**, ¶¶ 5, 7. Defendant presents his page to the public as one he operates in his official capacity rather than his personal capacity. *Id.* His page also has an "About" section. In the "About" section, Defendant describes himself as "President of the Colorado State Senate & Senator for Senate District 3." About, Senator Leroy Garcia (@senleroygarcia), FACEBOOK, https://www.facebook.com/pg/senleroygarcia/about/?ref=page_internal (last visited March 19,

2019); *see also* **Exhibit 1**, ¶¶ 8-9. Defendant's page is generally accessible to the public at large without regard to political affiliation or any other limiting criteria. Senator Leroy Garcia (@senleroygarcia), FACEBOOK, https://www.facebook.com/senleroygarcia/ (last visited March 19, 2019); *see also* **Exhibit 1**, ¶¶ 5-6. Any member of the public can view his posts. *Id.* Any Facebook user who wants to follow Defendant's page can do so and his page has 2,121 followers. Community, Senator Leroy Garcia (@senleroygarcia), FACEBOOK, https://www.facebook.com/pg/senleroygarcia/community/?ref=page_internal (last visited March 19, 2019); *see also* **Exhibit 1**, ¶¶ 5-6. Any Facebook user can also comment on Defendant's posts, or post on his timeline, unless they have been banned. Community, Senator Leroy Garcia (@senleroygarcia), FACEBOOK, https://www.facebook.com/pg/senleroygarcia/posts/?ref=page_internal (last visited March 19, 2019); *see also* **Exhibit 1**, ¶ 5. Defendant uses his page to promote official government business and he uses the account to directly communicate with his constituents in his official capacity as President of the Colorado Senate. *Id.*; *see also* **Exhibit 1**, ¶ 6. The content of Defendant's official Facebook page is controlled by him, in that Defendant makes determinations regarding what users may comment on his posts.

The comment threads on Defendant's official Facebook page are important forums for discussion and debate about governmental policy. *Id.* His page functions as a digital town hall in which Defendant communicates official Colorado news and information to the public and members of the public can comment on that news and information to both respond to Defendant and exchange views with other members of the public. *Id.*

2.3 **Defendant Garcia blocks Plaintiff from his official Facebook page and deletes his critical comments.**

On November 21, 2018, Senate Democrats fired the nonpartisan Senate Secretary, Effie Ameen, for allegedly partisan reasons. **Exhibit 1**, ¶ 12. A new Senate Secretary, Cindy Markwell, was then hired by the Senate Democrats to replace Ms. Ameen. Defendant was involved in the firing of Ms. Ameen. *Id.*

A day or so after Ms. Ameen was fired, Plaintiff read a media report that Defendant had been integral to her firing. *Id.*, ¶ 13. Plaintiff read, and discovered after doing some research, that the appointment of Ms. Markwell, which Defendant Garcia allegedly participated in, was illegal. *Id.* According to state law and Colorado Senate rules, all members of the Senate must vote to elect a new secretary. *Id.* In the wake of discovering this scandal, Plaintiff called Defendant's office and asked if he had a statement about the firing of Ms. Ameen. *Id.*, ¶ 14. The staff at Defendant's office told him that Defendant had "no comment" and hung up on Plaintiff. *Id.*

After being stonewalled by Defendant's staff, Plaintiff commented on Defendant's official Facebook page on November 26, 2018. *Id.*, ¶ 15. On Defendant's official Facebook page, Plaintiff stated "Either you are grossly incompetent or knowingly violated the law. Step down." *Id.* Plaintiff linked to a news article describing the incident involving the Senate Secretary. *Id.*; *see* Kyle Clark, *Botched firing causes confusion in the Colorado legislature*, 9NEWS, https://www.9news.com/article/news/local/next/botched-firing-causes-confusion-in-the-colorado-legislature/73-618586918. In response, Defendant Garcia deleted Mr. Armijo's comment a few days after it was posted and banned him from commenting further on his page. *Id.*, ¶¶ 17-19. Defendant Garcia banned Mr. Armijo, and deleted his comment, in retaliation for Mr. Armijo's comment on his post. *Id.*, ¶¶ 21-22. His retaliatory actions were premised on Mr. Armijo's political opposition to his participation in the firing of Ms. Ameen for allegedly partisan reasons. *Id.*

Because Defendant banned Plaintiff, he can no longer comment on posts on Defendant's official Facebook page. *Id.*, ¶¶ 19-20. He can no longer interact with other users in comment threads or view other users' comments. *Id.* Each new Facebook post by each Defendant represents another discussion Plaintiff is foreclosed from participating in.

3. **Standard of Review**

In considering whether to issue a preliminary injunction, this Court must analyze: (1) whether Plaintiff has a substantial likelihood of prevailing on the merits, (2) whether Plaintiff faces a threat of irreparable harm if the injunction is not granted, (3) the balance between the harm endured by Plaintiff absent an injunction and the injury that the injunction's issuance would inflict upon Defendant, and (4) whether the public interest is served by an injunction. *American Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1155 (10th Cir. 1999). "When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Minnesota Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2011) (en banc) (internal quotation marks omitted). Accordingly, when plaintiffs are "likely to win on the merits of [their] First Amendment claim, a preliminary injunction is proper." *Id.* at 877.

4. **Argument**

4.1 **Plaintiff has a substantial likelihood of prevailing on the merits.**

4.1(a) Defendant's banning of Plaintiff from his official Facebook page, and deletion of Plaintiff's comment on his official Facebook page, violates the First Amendment's free speech clause.

The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech[.]" U.S. Const. amend. I; *see also Gitlow v. New York*, 268 U.S. 652, 666 (1925) (holding that the First Amendment applies to the states and municipalities through the Fourteenth

Amendment's Due Process Clause). To determine whether the First Amendment's guarantee of freedom of speech has been violated, this Court must first decide whether the speech in which Plaintiff seeks to engage, and has engaged in, "is speech protected by the First Amendment." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). Then, this Court must determine the putative forum's classification, *i.e.* whether it is a traditional public, designated public, limited, or nonpublic forum. *Id.* at 800. Finally, the Court must determine whether "the extent to which the Government [has] control[led] access" to the forum is consistent with the class of forum. *Id.*

Defendant has violated Plaintiff's First Amendment rights by banning Plaintiff from commenting on posts on his official Facebook page. Defendant's official Facebook page is a designated public forum for free speech that is being used as an instrument of governance and, accordingly, is subject to the First Amendment. Defendant's banning of Plaintiff, and the deletion of his comment on Defendant's post, were viewpoint-based actions. The banning of Plaintiff imposes an unconstitutional restriction on his speech in a designated public forum.

4.1(a)(1) *Plaintiff's speech is protected by the First Amendment.*

Plaintiff wishes to engage in political speech by sharing his viewpoints on Defendant's official Facebook page and has been banned from doing so. Specifically, Plaintiff seeks to criticize the official actions of a sitting state senator, which can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Snyder v. Phelps,* 131 S. Ct. 1207, 1216 (2011) (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)). Such speech "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Id.* at 1207.

There is no reasonable argument that Plaintiff's speech falls within the "well-defined and narrowly limited classes of speech," such as obscenity, defamation, fraud, incitement, and speech integral to criminal conduct, "the prevention and punishment of which have never been thought to raise any Constitutional problem." *See Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 791 (2011) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942)). Plaintiff's speech is therefore entitled to First Amendment protection. *See Knight First Amendment Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 565 (S.D.N.Y. 2018) (holding that twitter comments on President Trump's personal Twitter page were First Amendment protected political speech).

> 4.1(a)(2) *The interactive space associated with Defendant's official Facebook page (wherein users can comment and reply to other users' comments) is a designated public forum.*

"[A] public forum may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech." *Cornelius*, 473 U.S. at 802; *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983); *Make The Road by Walking, Inc. v. Turner*, 378 F.3d 133, 142–43 (2d Cir. 2004). Defendant's official Facebook page is accessible to anyone with a Facebook account without regard to political affiliation or any other limiting criteria. Defendant has not published any rule or policy purporting to restrict, by form or subject matter, the speech of those who participate in the forum. Nor has he sought to limit the forum to specific classes of speakers based on their status — *e.g.*, Defendant's family, friends, or business colleagues. Defendant has permitted anyone who wants to follow the account to do so. That Defendant has banned Plaintiff for his comment is further evidence that Defendant is attentive to the comment threads on his Facebook posts.

Defendant purposefully opened this forum to speech by the general public and this conscious decision is evidenced by his opting to use Facebook, an inherently interactive platform. The decision of Defendant to use Facebook, specifically, to communicate with the public is powerful evidence of an intent to create a forum open to speech by the public at large. The ability to comment on posts on Defendant's official Facebook page is clearly "compatible with the intended purpose" of his page, *see Ark . Educ. Tv Comm'n v. Forbes*, 523 U.S. 666, 673 (1998), as Facebook users understand that the "principal purpose" of the site is to promote "the free exchange of ideas[,]" *see Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 679 (1992). And, even beyond what would be possible in a physical forum, Defendant's official Facebook page is "capable of accommodating a large number of public speakers without defeating the essential function of . . . the program." *See Pleasant Grove City v. Summum*, 555 U.S. 460, 478 (2009). As the Supreme Court emphasized in *Packingham*, social media platforms like Facebook offer "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard," in part because these platforms permit citizens to "engage with [their elected representatives] in a direct manner." *Packingham*, 137 S. Ct. at 1737.[3]

The majority of cases that have addressed this specific issue, namely whether a government official's social media page is a limited public forum for free speech, have answered

---

[3] The Supreme Court's case law regarding public broadcasters also supports the conclusion that the Defendant's official Facebook page is a designated public forum. Although public broadcasters generally are not subject to scrutiny under the forum doctrine, in *Forbes* the Court found candidate debates to be an exception to this rule, reasoning that a debate is "by design a forum for political speech by the candidates . . . with minimal intrusion by the broadcaster." 523 U.S. at 675. Facebook users, including Plaintiff, responding to Defendant's Facebook posts participate in discussions on important policy topics with virtually no editorial intrusion, and Facebook allows for far broader participation than a televised debate. Thus, Facebook and other interactive social media fit within the public forum rubric, not the more deferential doctrines generally applicable to traditional media. *Cf. Reno*, 521 U.S. at 868–69 (declining to treat speech on the "vast democratic forums" of the Internet similarly to broadcast media).

that question affirmatively.[4] In a recent decision, the Southern District of New York held that the "interactive space associated with a tweet" (specifically the ability to reply to a tweet, view replies, and reply to other replies) of President Trump's constituted a designated public forum. *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 573-75 (S.D.N.Y. 2018). The Court started by recognizing that "governmental intent" is "the touchstone for determining whether a public forum has been created." *Id.* at 574 (quoting *Gen. Media Commc'ns, Inc. v. Cohen*, 131 F.3d 273, 279 (2d Cir. 1997)). The Court then concluded that the interactive space associated with the President's Twitter account had been intended to be open to free speech because: (1) the President's Twitter account "is generally accessible to the public at large without regard to political affiliation or any other limiting criteria"; (2) "any member of the public can view his tweets"; (3) "anyone with a Twitter account who has not been blocked may participate in the interactive space by replying or retweeting the President's tweets"; "the account -- including all of its constituent components -- has been held out. . . as a means through which the President 'communicates directly with you, the American people'"; and (5) there was "no serious suggestion that the interactive space is incompatible with expressive activity[.]" Similarly, in this case, the interactive space associated with Defendant's official Facebook page (and the Facebook platform) are consistent all the characteristics the court in *Knight First Amendment Inst. at Columbia Univ.* found dispositive of the forum analysis issue. *See also*

---

[4] In addition to the cases outlined in depth in the following paragraphs, multiple other courts have found that the interactive space related to a government official's social media account are public fora for free speech. *See One Wis. Now v. Kremer*, No. 17-cv-0820-wmc, 2019 U.S. Dist. LEXIS 8828, at *30-32 (W.D. Wis. Jan. 18, 2019) (holding that the interactive space related to state legislators' official Twitter accounts were designated public fora); *Davison v. Plowman*, No. 1:16cv180 (JCC/IDD), 2017 U.S. Dist. LEXIS 4348, at *9 (E.D. Va. Jan. 10, 2017) (holding that the comment section to the Commonwealth Attorney's Facebook page was a limited public forum).

*Dingwell v. Cossette*, No. 3:17-CV-01531 (VLB), 2018 U.S. Dist. LEXIS 95832, at *12-13 (D.

Conn. June 7, 2018) (citing *Knight First Amendment Inst. at Columbia Univ. v. Trump* in holding

that the plaintiff had stated a colorable claim of First Amendment retaliation when he had been

banned from commenting on a local police department's official Facebook page based on

comments critical of the department because of the "public nature of the forum").

Moreover, in a directly on-point published decision, the Eastern District of Virginia was

asked to determine whether a government official's *personal* Facebook *profile*, and not an

official Facebook page, was a designated public forum. *Davison*, 267 F. Supp. 3d at 716. In

reaching the conclusion that it was, the court recognized that, "[w]hen one creates a Facebook

page, one generally opens a digital space for the exchange of ideas and information." *Id*. It also

held that because the official had "allowed virtually unfettered discussion" on her Facebook page

and had solicited comments from her constituents that the official's actions qualified as a

"governmental 'designation of a place or channel of communication for use by the public'" that

was "more than sufficient to create a forum for speech." *Id*. (quoting Cornelius, 473 U.S. at 802);

*cf. Page v. Lexington County Sch. Dist. One*, 531 F.3d 275, 284 (4th Cir. 2008) (suggesting that

forum analysis would be appropriate if a government website included "a type of 'chat room' or

'bulletin board' in which private viewers could express opinions or post information"). The

district court's determination in *Davison* that the government official's personal Facebook page

was a designated public forum was recently affirmed by the Fourth Circuit. *Davison v. Randall*,

912 F.3d 666, 682 (4th Cir. 2019). This case presents an even easier question. Defendant in this

matter has banned Plaintiff from commenting on posts on his *official* Facebook *page*. Based on

the *Davison* decision, it is clear that the interactive space associated with Defendant's official

Facebook page is a designated public forum.

Furthermore, in determining whether government officials have created a designated public forum, courts consider the forum's compatibility with expressive activity and whether the government's overall "policy and past practice" shows that the forum is intended to be used for speech by the public. *Paulsen v. Cty. Of Nassau*, 925 F.2d 65, 69 (2d Cir. 1991); *Cornelius*, 473 U.S. at 802. There is no question that the forum at issue here is compatible with expressive activity: the entire purpose of a Facebook page is to facilitate speech. Defendant's official Facebook page is a "metaphysical space," in the language of the Supreme Court, *Rosenberger*, 515 U.S. at 830, in which Defendant speaks and members of the public respond to, and engage with one another about, those statements. *See id.* (applying public forum analysis to student newspaper funding); *Perry Educ. Ass'n*, 460 U.S. at 46–47 (school mail system); *Cornelius*, 473 U.S. at 801 (charitable contribution program). The forum thus includes speech by Defendant =as well as speech by ordinary citizens—in the same way that a town hall meeting[5] ordinarily encompasses speech by government officials as well as speech by the assembled public.

---

[5] In essence, Defendant's official Facebook page functions like a digital town hall meeting—one in which Defendant stands at the front of the room and assembled citizens respond to his statements and engage with each other about those statements. The Tenth Circuit has specifically recognized that these types of meetings constitute designated public fora. *Mesa v. White*, 197 F.3d 1041, 1044-45 (10th Cir. 1999). And other courts have near unanimously agreed "that a designated public forum exists when a governmental body affords the public an opportunity to address the body at its meeting." *Piscottano v. Town of Somers*, 396 F. Supp.2d 187, 201 (D. Conn. 2005); *see, e.g.*, *White v. City of Norwalk*, 900 F.2d 1421, 1425 (9th Cir. 1990) ("City Council meetings . . . where the public is afforded the opportunity to address the Council[] are the focus of highly important individual and governmental interests . . . . [S]uch meetings, once opened, have been regarded as public forums, albeit limited ones."); *Jones v. Heyman*, 888 F.2d 1328, 1331 (11th Cir. 1989) ("[T]he city commission designated their meeting a public forum when the commission intentionally opened it to the public and permitted public discourse on agenda items."); *Surita v. Hyde*, 665 F.3d 860, 869 (7th Cir. 2011) (expressing "no doubt" that "audience time during . . . city council meetings constituted a designated public forum); *Musso v. Hourigan*, 836 F.2d 736, 742 (2d Cir. 1988) (noting that public speech is usually allowed at an open school board meeting); *Scroggins v. City of Topeka*, 2 F.Supp.2d 1362, 1370 (D. Kan. 1998) (characterizing a city council meeting as a designated public forum); *Zapach v. Dismuke*, 134 F.Supp.2d 682 (E.D. Pa. 2001) (holding that a zoning hearing board meeting was designated

Although Defendant was "not required to create the forum in the first place," he has chosen to establish his official Facebook page as a venue that is "open for use by the general public." *See Perry Educ. Ass'n*, 460 U.S. at 45, 47. Defendant has affirmatively chosen to use Facebook's speech-enhancing features. Defendant cannot avoid the strictures imposed on public fora merely because Facebook is not owned by the government. Defendant's use of Facebook is akin to the government renting a suitable space to hold its public meetings, rather than hosting meetings in space it owns. *See generally* Lyrissa Lidsky, *Public Forum 2.0*, 91 B.U. L. REV. 1975, 1996 (2011) ("[G]overnment ownership is not a *sine qua non* of public forum status."). Defendant is the exclusive user of his official Facebook page, and he, not Facebook, exercises effective control over the public's access to the feed and the public's ability to interact there. The interactive space associated with Defendant's official Facebook page (wherein users can comment and reply to other users' comments) is a designated public forum

> 4.1(a)(3) *Defendant's banning of Plaintiff, and deletion of his comments, is unconstitutional viewpoint discrimination.*

It is well established that the government is forbidden from engaging in viewpoint discrimination in a public forum. *Rosenberger*, 515 U.S. at 828, 829–30 ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys," and the government is forbidden from engaging in viewpoint discrimination "even when the . . . public forum is one of its own creation"); *Mesa*, 197 F.3d at 1047 ("[V]iewpoint discrimination is almost universally condemned and rarely passes constitutional scrutiny."); *Davison*, 267 F. Supp. 3d at 716 (same). "[G]overnment may not grant the use of a forum to people whose views it

---

public forum); *Pesek v. City of Brunswick*, 794 F.Supp. 768, 782 (N.D. Ohio 1992) (holding that a city council meeting open to public was a designated public forum).

finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972).

Here, there can be little dispute that Defendant banned Plaintiff because of his viewpoint. Defendant banned Plaintiff, and deleted his comment, almost immediately after he posted comments critical of Defendant's stance. And nearly all of the comments that remain on Defendant's official Facebook page are supportive of Defendant.

Moreover, the record makes clear that the injury to Plaintiff's speech rights is tangible and real. As a result of the banning, Plaintiff cannot read the comments on, comment on, or respond to other comments on posts on Defendant's official Facebook page. And Plaintiff's speech is burdened in this way only because he made statements criticizing Defendant's position. No conceivable government interest could justify the imposition of this burden on Plaintiff's core political speech. *See, e.g.*, *Tam*, 137 S. Ct. at 1765 ("[I]t is a fundamental principle of the First Amendment that the government may not punish or suppress speech based on disapproval of the ideas or perspectives the speech conveys."); *Rosenberger*, 515 U.S. at 829 (observing that viewpoint discrimination is "blatant," "egregious," and presumptively unconstitutional).

Finally, the fact that Plaintiff may be able to express his views elsewhere on Facebook, or on the Internet, does not alleviate the injuries he has suffered. "If restrictions on access to a . . . public forum are viewpoint discriminatory, the ability of a group to exist outside the forum would not cure the constitutional shortcoming." *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings College of Law v. Martinez*, 561 U.S. 661, 690 (2010); *see also Reno*, 521 U.S. at 879–80 (rejecting the government's suggestion that, under the statute at issue, the speaker's ability to post content elsewhere on the Internet would suffice to cure the constitutional harm).

4.1(a)(4) *Even if this Court determines that the interactive space associated with Defendant's official Facebook pages is a*

> *nonpublic forum, Defendant's banning of Plaintiff, and deletion of his comments, is unconstitutional viewpoint discrimination.*

Regardless of the forum, government action that imposes viewpoint discrimination violates the First Amendment. *Cornelius*, 473 U.S. at 806; *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001). "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger*, 515 U.S. at 828. This is true even in non-public fora. *Cornelius*, 473 U.S. at 800; *Perry Education Ass'n*, 460 U.S. at 46 (holding that even in a non-public forum, a speaker may not be excluded as "an effort to suppress expression merely because public officials oppose the speaker's views"); *City of Madison Joint Sch. Dist. No. 8*, 429 U.S. at 175 (holding that government could not exclude people from open school board meetings based on viewpoint).

As demonstrated *supra* in Section 4.1(a)(3), it is clear Plaintiff was banned from commenting, and viewing the comments, on Defendant's official Facebook page because of his speech criticizing Defendant. And other courts have held that viewpoint discrimination of this nature violates the First Amendment. In *Leuthy v. LePage*, the Maine District Court held that Governor Paul LePage's banning of a number of Facebook users with dissenting viewpoints from commenting on his official Facebook page based on their viewpoint stated a First Amendment claim, without deciding whether the Governor's Facebook page was a traditional, designated, limited, or nonpublic forum. No. 1:17-cv-00296-JAW, 2018 U.S. Dist. LEXIS 146894, at *22-23 (D. Me. Aug. 29, 2018). In holding that viewpoint discrimination by the government in banning members of the public from commenting on official Facebook pages violates the First Amendment no matter the character of the forum, the Court reasoned that the right to disseminate speech about political issues on social media is "an area highly protected by

the First Amendment" and that "whether the Facebook page is a public forum, a designated public forum, or a non-public forum, viewpoint discrimination is not permissible." *Id.*

Moreover, in another analogous case, the Court in *Price v. City of N.Y.* held that it was of no difference whether the interactive space relating to a government official's social media account was a public, designate, limited, or nonpublic forum, because the plaintiff had alleged viewpoint discrimination and, therefore, had alleged a First Amendment violation. 2018 U.S. Dist. LEXIS 105815, at *39 (S.D.N.Y. June 25, 2018). The Court denied the defendant's motion to dismiss because "[r]egardless of whether it occurs in a public, designated, or nonpublic forum, viewpoint discrimination that results in the intentional, targeted expulsion of individuals from these forums violates the Free Speech Clause of the First Amendment." *Id.* Plaintiff in this case has shown that his comments were censored, and he was banned, because of his criticism. Viewpoint discrimination by the government is unconstitutional, no matter the forum.

Ultimately, allowing Defendant to continue to feign democratic engagement while squelching skeptical voices runs contrary to the Supreme Court's teachings about why viewpoint discrimination is so corrosive to democratic functioning: "the prohibition on viewpoint discrimination serves that important purpose of the Free Speech Clause, which is to bar the government from skewing public debate[.]" *See Rosenberger*, 515 U.S. at 894 (Souter, J., dissenting). Plaintiff asks that this Court enjoin Defendant from purposefully misrepresenting the amount of public support he has garnered.

> 4.1(b) <u>Defendant's banning of Plaintiff imposes an unconstitutional restriction on his First Amendment right to petition the government for redress of grievances.</u>

Defendant's banning of Plaintiff also violates the First Amendment because it imposes a burden on his right "to petition the Government for a redress of grievances." U.S. Const. amend.

I. "The right to petition the Government is part of our heritage from earliest times and represents a cornerstone of our national liberty." *United States Postal Serv. v. Hustler Magazine, Inc.*, 630 F. Supp. 867, 872 (D.D.C. 1986). It is a right long-recognized as implicit in "the very idea of a government, republican in form." *United States v. Cruikshank*, 92 U.S. 542, 552 (1875). Courts have protected this right when its existence has arisen in varied contexts, from prisons, *Cruz v. Beto*, 405 U.S. 319, 321 (1972), to state capitols. *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963). And they have protected the right to petition in varied forms, from peaceful boycotts of private businesses, *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 907-11 (1982), to sending pornographic magazines through the mail to members of Congress. *Hustler Magazine, Inc.*, 630 F. Supp. at 872.

Though the right to speak and the right to petition are related, they are not duplicative. "The right to petition allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives, whereas the right to speak fosters the public exchange of ideas that is integral to deliberative democracy as well as to the whole realm of ideas and human affairs." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 388 (2011). Accordingly, the Supreme Court has counseled courts not to "presume . . . that Speech Clause precedents necessarily and in every case resolve Petition Clause claims." *Id.* Defendant's banning of the Plaintiff violates the Petition Clause even if the interactive space associated with Defendant's official Facebook page is not a public forum. This is because Defendant's official Facebook page is, among other things, a channel through which ordinary citizens can petition Defendant directly about his official actions and policies. Indeed, the Supreme Court observed just last term that social media's interactive features make it especially suited to this purpose. *Packingham*, 137 S. Ct. at 1735 ("[O]n [social media], users can petition their elected

20

representatives and otherwise engage with them in a direct manner."); *cf. Mirabella v. Villard*, 853 F.3d 641, 647 (3d Cir. 2017) (addressing petition via email). Moreover, Plaintiff was banned after he used the channel for the purpose of petitioning Defendant about his official decision to terminate the Colorado Senate secretary. *See Guarnieri*, 564 U.S. at 394–95 (noting that petitions "assume an added dimension when they seek to advance political, social, or other ideas of interest to the community as a whole").[6] Thus, Plaintiff's right to petition the government here has an "added dimension" of entitlement to protection. *See id.*

Plaintiff does not contend that Defendant is under any mandate to create and maintain an official Facebook page as a channel through which members of the public may exercise their Petition Clause rights. Having made the channel available, however, Defendant cannot constitutionally close the channel solely to those who disagree with him. *See Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668, 680 (1996) (noting that "the government has no legitimate interest in repressing" "ordinary citizens['] . . . viewpoints on matters of public concern"); *Lamb's Chapel v. Ctr. Moriches Union Free School Dist.*, 508 U.S. 384, 394 (1993) ("[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others."); *Mirabella*, 853 F.3d at 649–50 (holding retaliation for petition activity unconstitutional).

> 4.1(c)  Defendant's official Facebook page is subject to the First Amendment and his banning of Plaintiff and deletion of his comments is state action.

---

[6] The First Amendment protects the right to petition even when the right is exercised in a manner that officials deem to be offensive. *See, e.g., U.S. Postal Serv. v. Hustler Magazine, Inc.*, 630 F. Supp. 867, 871 (D.D.C. 1986) ("As elected representatives of the people," members of Congress "cannot simply shield themselves from undesirable mail in the same manner as an ordinary addressee.").

Title 42 U.S.C. § 1983 provides "a federal cause of action for damages to vindicate alleged violations of federal law committed by individuals acting under color of state law." *Jojola v. Chavez*, 55 F.3d 488, 492 (10th Cir. 1995) (quotations and citations omitted). To state a claim under § 1983, a plaintiff must allege the violation of a constitutional right and must show that the alleged deprivation of that right was "committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 28 (1988).

As demonstrated *supra* in Section 4.1(a) and Section 4.1(b), Defendant violated Plaintiff's First Amendment rights.

Defendant's banning of Plaintiff from commenting on Defendant's official Facebook page, and his deletion of Plaintiff's comments, constitutes state action and his actions in banning Plaintiff from his official Facebook page were committed under color of state law. A state employee "who violates another individual's federal rights will 'generally' (i.e., in most cases), do so by virtue of the authority vested in them under state law." *Jojola*, 55 F.3d at 493 (citation omitted). Where there is "'a real nexus' between the employee's use or misuse of [her] authority as a public employee and the violation allegedly committed by the defendant," the plaintiff has established that the defendant's conduct was "fairly attributable to the state" and, thus, the defendant acted under color of law. *Id.* (citations omitted).

Defendant's operation of his official Facebook page relates to "an actual or apparent duty of [his] office," *Davignon v. Hodgson,* 524 F.3d 91, 112 (1st Cir. 2008), and therefore demonstrates "a real nexus" between his use, and misuse, of his authority and the violation of Plaintiff's First Amendment rights. *Jojola*, 55 F.3d at 493. Defendant's official Facebook page is designated as his official page as Senate President and invokes his official titles. *Leuthy*, No. 1:17-cv-00296-JAW, 2018 U.S. Dist. LEXIS 146894, at *22-23 (holding that Maine Governor

Paul LePage's banning of the plaintiffs from commenting on his official Facebook page constituted state action, subjecting Governor LePage's banning to the First Amendment); *Garnier v. Poway Unified Sch. Dist.*, No. 17-cv-2215-W (JLB), 2018 U.S. Dist. LEXIS 87987, at *8-9 (S.D. Cal. May 24, 2018) (holding that government officials were acting under color of state law when they banned plaintiffs from posting messages on their official Facebook pages); *One Wis. Now*, 2019 U.S. Dist. LEXIS 8828, at *22 (holding that state legislators' blocking individuals from commenting on, and viewing, their official Twitter accounts constituted state action); *Cf. German v. Eudal Y*, No. 3:17-cv-2028-MO, 2018 U.S. Dist. LEXIS 109151, 2018 WL 3212020, at *6 (D. Or. Jun. 29, 2018) (finding that city commissioner's posting to her undisputed personal, non-official Facebook page, when she also maintained an official Facebook page, did not constitute state action).

Moreover, Defendant has certainly made efforts to "swathe [his] Facebook page in the trappings of h[is] office." *See Davison*, 267 F. Supp. 3d at 714 *affirmed by Davison*, 912 F.3d 682. For example, it is readily apparent that Defendant's official Facebook page is used to keep his "constituents abreast of h[is] activities . . . and of important events in [state] government." *See id*. His page "includes [his] title" as Senator and Senate President. *See id.* Furthermore, as the "About" section of his official Facebook page states, describes himself as "President of the Colorado State Senate & Senator for Senate District 3." Additionally, Defendant uses his page to share his official position on political issues with his constituents. Thus, his official Facebook page "has a strong tendency toward matters related to Defendant's office" and is aimed at keeping his "constituents abreast of h[is activities as [Senate PResident,] and of important events in [state] government." *See Davison*, 267 F. Supp. 3d at 714. Thus, Defendant's official

Facebook page possesses "the 'requisite nexus' with h[is] 'public office' to be fairly attributable to the government." *See id.* (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)).

> 4.1(d) <u>Defendant's banning of Plaintiff from his official Facebook page, and deletion of Plaintiff's comment on his official Facebook page, violates the Colorado Constitution's free speech clause.</u>

In Colorado, "[t]he First Amendment is a floor, guaranteeing a high minimum of free speech, while our own Article II, Section 10 is the 'applicable law' under which the freedom of speech in Colorado is further guaranteed." *Bock v. Westminster Mall Co.*, 819 P.2d 55, 5 (Colo. 1991) (citation omitted). The Colorado Supreme Court has stated that the Colorado Constitution "guarantees greater protections of . . . rights of speech than is guaranteed by the First Amendment." *Id.* at 58. The Colorado Supreme Court did so consistent with the Supreme Court of the United States' decision in *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980), wherein the Court "explicitly acknowledged each State's 'sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution.'" *Bock*, 819 P.2d at 59 (quoting *PruneYard Shopping Center*, 447 U.S. at 81).

For the reasons outlined *infra* <u>Section 4.1(a)</u>, because Defendant's actions violate the First Amendment, Defendant's actions also violate Plaintiff's more expansive free speech rights under the Colorado Constitution.

4.2 **Plaintiff will suffer irreparable harm absent issuance of an injunction.**

Plaintiff meets the second factor, "irreparable harm," because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *See Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012) ("[W]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). Absent an injunction, Plaintiff continues

to be foreclosed from engaging in First Amendment free speech and from petitioning the government. Because Plaintiff has established that he is likely to succeed on the merits, he has also established irreparable harm as the result of the deprivation of his First Amendment rights. *See, e.g.*, *See Cmty. Communications v. City of Boulder*, 660 F.2d 1370, 1376 (10th Cir. 1981); *Johnson*, 194 F.3d at 1163. Plaintiff will face irreparable injury absent injunction of Defendant's actions.

### 4.3 **The balance of harms weighs in favor of issuing an injunction.**

The injury to a plaintiff deprived of his or her legitimate First Amendment rights almost always outweighs potential harm to the government if the injunction is granted. *Awad*, 670 F.3d at 1131; *Johnson*, 194 F.3d at 1163; *see also Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds by Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012) ("The balance of equities . . . generally favors the constitutionally-protected freedom of expression."). Additionally, there is no rational argument that Defendant would be harmed by unbanning Plaintiff from his official Facebook page. Thus, in the absence of harm to Defendant, and considering that the continued banning of Plaintiff from commenting on Defendant's page violates Plaintiff's First Amendment rights, the balance of harms weighs in Plaintiff's favor.

### 4.4 **It is in the public interest to issue an injunction.**

Injunctions blocking state action that would otherwise interfere with First Amendment rights are consistent with the public interest. *Elam Constr. v. Reg. Transp. Dist.,* 129 F.3d 1343, 1347 (10th Cir.1997) ("The public interest . . . favors plaintiffs' assertion of their First Amendment rights."); *Utah Licensed Beverage Ass'n*, 256 F.3d at 1076; *Johnson,* 194 F.3d at 1163; *Local Org. Comm., Denver Chap., Million Man March v. Cook*, 922 F. Supp. 1494, 1501 (D. Colo. 1996). In other words, "it is always in the public interest to prevent a violation of a

party's constitutional rights." *Awad*, 670 F.3d at 1132; *Phelps-Roper*, 545 F.3d at 689; *Cate v. Oldham*, 707 F.2d 1176, 1190 (10th Cir. 1983) (noting "[t]he strong public interest in protecting First Amendment values"). Again, Defendant's actions continue to violate Plaintiff's First Amendment rights. This factor weighs strongly in Plaintiff's favor.

5. **Request for Relief**

Plaintiff asks that this Court enjoin Defendant from banning Plaintiff from Defendant's official Facebook page and, also, to enjoin Defendant from deleting any further comments made by Plaintiff on Defendant's official Facebook page on issues of public concern.

6. **Bond**

Normally, a party awarded a preliminary injunction normally must "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). However, the Tenth Circuit has held, that "a trial court may, in the exercise of discretion, determine a bond is unnecessary to secure a preliminary injunction if there is an absence of proof showing a likelihood of harm." *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987) (internal quotation marks omitted); *see also* 11A Charles Alan Wright et al., *Federal Practice & Procedure* § 2954 n.29 (3d ed., Apr. 2016 update) (citing public rights cases where the bond was excused or significantly reduced). Issuance of an injunction would not harm Defendant and, therefore, Plaintiff asks that this Court waive bond (or set it at a nominal amount) in issuing an injunction.

7. **Conclusion**

Plaintiff respectfully requests that this Court grant his Motion for Preliminary Injunction, enjoin Defendant from continuing to ban Plaintiff from Defendant's official Facebook page, and

enjoin Defendant from deleting any further comments made by Plaintiff on Defendant's official Facebook page on issues of public concern.

DATED this 25th day of March 2019.

KILLMER, LANE & NEWMAN, LLP

*s/ Andy McNulty*

_____
Darold W. Killmer
Andy McNulty
Tania Valdez
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
(303) 571-1001
dkillmer@kln-law.com
amcnulty@kln-law.com
tvaldez@kln-law.com

ATTORNEYS FOR PLAINTIFF